## TOWNSEND v. TRUSTEES OF FREEHOLDERS AND COMMONALTY OF TOWN OF BROOKHAVEN et al.

(Supreme Court, Appellate Division, Second Department. October 11, 1904.)

1. REAL PROPERTY—EXERCISE OF OWNERSHIP—INJUNCTION—LEASE—CANCELLATION—TITLE—BURDEN OF PROOF.

In a suit to restrain the exercise of ownership over real property, and to have a lease thereof declared canceled and void, the primary question is the strength of the plaintiff's title, not the weakness of that of his adversary.

2. SAME—JUDICIAL NOTICE—COLONIAL LAWS.

In a suit to restrain the exercise of ownership over real property, and to have a lease thereof declared canceled and void, the court will take judicial knowledge of the colonial and earlier laws which bear on the title involved.

3. SAME—TITLE—FINDING—EVIDENCE—SUFFICIENCY.

In a suit to restrain the exercise of ownership over Lake Ronkonkoma on Long Island, and have a lease thereof, executed by the town of Brookhaven as lessor, declared canceled and void, evidence examined, and a finding that the title to the lake is in the town of Brookhaven *held* not supported thereby.

4. COUNTRY ROADS—WHAT CONSTITUTE—COLONIAL LAWS.

Under the colonial laws a country road was one which belonged to the country, and was under the direct charge of the country, as distinguished from the owners of the towns and manors, and it was a necessary line of communication between sparsely settled communities, and it was for the better laying out, repairing, and preserving the public and general highways within the colony that the legislation as to such roads was adopted.

Appeal from Special Term, Suffolk County.

Suit by Edward M. Townsend, individually and as executor under the will of Belinda R. Townsend, deceased, against the trustees of the freeholders and commonalty of the town of Brookhaven and another. From a judgment dismissing the complaint on the merits, plaintiff appeals. Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

Charles F. Brown and Wilmot T. Cox, for appellant.

George H. Furman (Walter H. Jaycox, on the brief) and Robert S. Pelletreau, for respondents.

WOODWARD, J. The plaintiff brings this action to restrain the defendant corporation, the trustees, etc., of Brookhaven (hereafter referred to as Brookhaven), and all persons claiming under them, from exercising acts of ownership over the eastern portion of Lake Ronkonkoma, Suffolk county, one of the principal fresh-water ponds on Long Island, said to change the quantity of its water at periods of four years (14 Ency. Brit. [9th Ed.] 865), and to have a lease of certain rights in the lake, made by the said corporation to the defendant Lucy McKittrick, declared canceled and void. The primary question, of course, is the strength of the plaintiff's title, not the weakness of that of his

¶ 1. See Quieting Title, vol. 41, Cent. Dig. § 36.

adversary; and, the learned court at Special Term having dismissed the complaint upon the merits, the presumptions are in favor of the judgment.

On the 3d day of March, 1665, Gov. Nicolls granted to one Richard Smith a patent for Smithtown, "bounded eastward with the line lately run by Seatalcott (Brookhaven) as the bounds of their town, bearing southward to a certain fresh pond called Ranconkamuck; from thence southwestward to the head of Nesaquake river." On the 7th of March following Gov. Nicolls issued a patent, in which it was recited:

"Whereas, there is a certain Town in the East Riding of Yorkshire upon Long Island commonly called and known by the name of Brookhaven and heretofore by the Indian name of Setaulcott, Now in ye Tenure or occupation of several freeholder and inhabitants who having heretofore made lawful purchase of the lands thereunto belonging, have likewise manured and improved a considerable part thereof, and settled a competent number of families thereupon: Now for a confirmation unto the said Freeholder and inhabitants in their enjoyment and possession of the premises, know ye that by virtue of the commission and authority unto me given by his Royal Highness, I have ratified, confirmed and granted, and by these presents, do ratify, confirm and grant unto Capt. John Tucker, Mr. Daniel Lane, Mr. Richard Woodhull, Henry Perring and John Jenner, as Patentee for and on the behalf of themselves and their associates, and Freeholders and inhabitants of the said Town of Brookhaven, their heirs, successors and assigns, All that tract of land which already hath been or that hereafter shall be purchased, for and on the behalf of the said Town, whether from the native Indian proprietors or others within the bounds and limits hereafter set forth and expressed: That is to say, the west bounds to begin at the line run by the inhabitants of the said town between them and Mr. Smith's lands, of Nesaquake, as in his patent is set forth, and to go east to the head of Wading River or Red Creeke, from whence as also from their west bounds, to stretch north to the sound and south to the sea or Main Ocean: All which said tract of land within the bounds and limits aforesaid and all or any plantations thereupon, from henceforth are to belong and appertain to the said Town: Together with all Havens, harbors, creeks, quarrys, woodlands, meadows, pastures, marshes, waters, rivers, lakes, fishing, hawking, hunting and fowling, And all other profits, commodities, emoluments and hereditaments to the said land and premises within ye limits and bounds aforementioned described belonging or in any wise appertaining: To have and to hold, all and singular the said lands, hereditaments and premises with their and every of their appurtenances, and of every part and parcel thereof, to the said Patentees and their Associates, their heirs, successors and assigns, to the proper use and behoof of the said patentees and their associates their heirs, successors and assigns forever." (The patent also confirms the existence and guaranties the privileges of a town under the name of Brookhaven, the political boundaries of which are above described.)

It is to be observed that this patent does not grant any land to the trustees of Brookhaven. It merely confirms in the corporation the title to such lands as have been purchased or may hereafter be purchased from the Indian proprietors or others within the political bounds of the town. In support of their title the trustees of Brookhaven present a deed from Gie, sachem, to themselves, which ratifies and confirms to them "all those certain parcels of land that have been bought of any of us, or our ancestors; that is to say, From the west line which runs from Stony Brook to the North Sea (Sound), and South to the middle of the Island, & so to extend to the head of the Wading River or Red Brook, and to the middle of the Island, South." This deed is merely confirmatory of such sales as had been made north of the middle

of the island, and vested such property in the town of Brookhaven. Richard Woodhull, by a deed dated November 23, 1675, undertakes to convey all of his interest derived from the Indians in the same locality; and a deed of Tobacus to Gov. Winthrop, without date, is for land "extending northward to the midst of the island," the Andros patent to Gov. Winthrop being bounded on the north by the "middle of the island."

The Dongan patent to Brookhaven creates a corporation under the name of the "Freeholders and Commonalty of the Town of Brookhaven," and confirms to it all the tracts of land that had passed by the first patent from Gov. Nicolls. It did not contain a grant of any additional land. Such portions of the land granted by the first patent as had passed into the ownership of particular persons were confirmed to them, and their heirs and assigns, and such portions as had not passed to particular persons were confirmed to the corporation, for the "use and benefit of the present freeholders and inhabitants, their heirs, successors, and assigns, in proportion to their several and respective settlements," etc. Up to this time there had been no effort to convey any land south of the center of the island.

With matters in this condition, Gov. Fletcher granted a patent to Col. William Smith in 1693 for the manor of St. George, in the eastern portion of the general bounds of the Brookhaven patent, embracing lands "not ever purchased by the townsmen of the Indian natives," and the northerly boundary of this patent is "the country roads near ye middle of the islandafore sd, to a markt tree there, the whole hollow included, and soe bounded northward by ye sd country road to another marked tree," etc. This is the first patent bounded by "the country road near the middle of the island," all the previous patents and grants running to "the middle of the island." Before the taking out of this patent, which bears date the 9th day of October, 1693, and on the 21st day of September of that year, Col. William Smith, who had previously purchased the Indian title, entered into an agreement with the trustees of Brookhaven, in which it was recited that "forasmuch as some dispute may arise concerning the north bounds of the said land, by the said Smith, purchased, which is to extend to the middle of the island aforesaid, we, therefore, the trustees of the town of Brookhaven aforesaid, to avoid all manner of cabells and disputes hereafter, for and in behalf of the Town aforesaid, their heirs and successors, firmly by these presents, covenant and agree with the said Col. William Smith, his heirs and assigns forever, and it is mutually agreed, by both parties, that the North bounds of the said Smith's purchase aforesaid, shall be held and esteemed to come within two poles of the now country or common road to the towns eastward, being esteemed near the middle of the Island aforesaid," etc. Great stress is placed upon the use of the expression "the now country or common road" by those desirous of supporting the judgment in the case at bar, it being urged that this indicates that there had been or were other country roads to which reference may have been made; but when we consider that this agreement was of a very early date, and that the highways remote from the larger settlements were merely paths in the woods, while the custom and demand of highways proper was of at least four rods in width (see chap-

ter 131, p. 532, 1 Colonial Laws New York), the reason for this agreement is made plain. It was the purpose of the parties to agree upon a line which would provide for a road four rods in width, and for this purpose it was agreed that the property should be "bounded northward within two poles (rods) of the country road aforesaid." That this is the true reason is made manifest by the subsequent provision: "That what shall be found by the present surveyor general within the east and west line, from South to North, shall be bounded northward within two poles of the Country road aforesaid, by marking some tree, or setting up some stake, which shall be the certain bounds betwixt the said Smith and the town aforesaid, their heirs and successors forever, and that what land within the east and west bounds is southward of the path shall be to him, the said Smith, and what land is northward of the said path shall be to the Town of Brookhaven, his and their heirs and successors and assigns forever, notwithstanding upon mesuringe the bredth of the Island aforesaid, the said path or country road shall not happen to be found to be the middle of the said Island." The country road, designed for a public highway of four rods in width in the future, was a mere path at the time of this agreement, and the line two rods south of the path was undoubtedly to provide Col. Smith's share of the highway when it should be opened to a proper width, as will more fully appear in the subsequent discussion of this case. There is testimony in the case which appears to us to warrant the conclusion that the country road referred to in the above agreement, as well as in the patent to Col. William Smith, is the same highway known as the country road or post road to-day. There is no dispute, so far as we discover, that St. George manor extended south from the location of the present post road, and we shall presently point out facts, of which we may take judicial notice, which will make this self-evident.

Four years from the granting of this patent to Col. Smith, in the eastern portion of the town of Brookhaven, Gov. Fletcher, the grantor, issued a license by order of the council to William Nicoll, by which the latter was permitted to purchase from the Indians "a certain tract of vacant land in Suffolke county bounded north by the country road, * * * together with the pond called Raconckomy for his improvement." On the 20th day of September, 1697, Gov. Fletcher issued a patent to William Nicoll "of a Certaine Parcell of Vacant unimproved Land in the County of Suffolke in the Island Nassau Part adjoining to the Land of our said Loving Subject and of Andrew Gibb Bounded Easterly by a Brooke or River to the Westward of a Point Called the Blew Point knowne by the Indian Name of Manowtassquott and a North and by East Line from the Head of said River to the Country Road thence along the said Road Westerly untill it Bears North and by East to the head of Orawake River and thence by a South and by West Line to the head of the said River and so Running Easterly along by the Lands of said William Nicoll and Andrew Gibb to the head of Connettquot and down the said River to the Sound and from thence along the Sound Easterly to the Mouth of Manowtassquott aforesaid together with a Certaine fresh Pond called Raconckomy Pond." The words of grant are that "we have Given Granted Ratified and Confirmed and by these Presents Do for us our Heirs and Successors

Give Grant Ratifie and Confirme unto the said William Nicoll All that said Certaine Tract of Land and Roconckomy Pond aforesaid Limited and Bounded as aforesaid together with all and singular the Messuages Tenements Buildings Barns Houses Outhouses Stables Edifices Orchards Gardens Inclosure fences Pastures fields feedings Woods Underwoods Trees Timber Swamps Meadows Marshes Pools Ponds Lakes fountains Waters Watercourses Rivers Rivoletts Runns Streams Brooks Creeks Harbours Coves inletts Outletts Islands of land and Meadow Necks of Land and Meadow Peninsulaes of Land and Meadow fishing fouling hunting and hawking and the Beach as farr as the said Land extends upon the sea Quarryes Mines Mineralls (Silver and Gold Mines only excepted) and all other the Rights Members Libertyes Privileges Jurisdiocons Preheminencyes Emoluments Royaltyes Profites Benefites Advantages Hereditaments and Appurtenances whatsoever to the aforerecited Certaine Tract of Land and Pond within the Limites and Bounds aforesaid belonging or in any ways Appertaining or Accepted reputed taken known or Occupyed as Part Parcell or Member thereof To have and to hold all the said Certaine Tract of Land and Raconckomy Pond aforesaid Limited and Bounded as aforesaid together with all and Singular the Messuages Tenements Buildings," etc.; repeating the list above set forth.

It is conceded that if the highway running east and west through Long Island to-day, and known as the country or post road, is the country road referred to in this grant; the description embraces Raconckomy Pond, and it determines the rights of the parties; for it is not claimed that any one ever had a grant of this lake from the original Indian owners, unless it was purchased by William Nicoll, to whom it was granted by name. The theory of the defendants is, however, that there was at some time, so remote that the learned trial justice does not attempt to fix the time, another country road to which this description related, and that this road ran south of the lake. This theory is supported by the learned court at Special Term, who suggests that "the language of the Nicoll license and patent is very significant, in that the lake or pond is not included within the bounds of the grant, for we see that the language is 'together with a certain fresh pond called Raconckomy Pond,' and again the conjunctive 'and' is frequently used. This would be needless, indeed, if the lake was within the bounds of the patent." This criticism, applied to a modern deed, might have some weight; but when we find in the same instrument the granting of "all that said certain tract of land and Raconckomy pond aforesaid, limited and bounded as aforesaid, together with all and singular the messuages, tenements, buildings, barns, houses, outhouses," etc., the force of it is materially weakened. The same expression is found in the Gov. Nicoll grant to Brookhaven, where he provides that "all which said tract of land within the bounds and limits aforesaid and all or any plantations thereupon, from henceforth are to belong and appertain to the said town, together with all havens, harbors, creeks, quarrys, woodlands, meadows, pastures," etc. Are we to say that these are not within the boundaries simply because they are mentioned "together with" other matters? The learned court at Special Term says: "South of the lake about one and one-half miles is a line now

known as the Furrows, and for almost two centuries past, also as 'Hart's Line'; there was, very many years ago, according to tradition, an old road along that line, which road has not been used as such within the memory of any of the witnesses, though evidences of the road still remain;" and "from all the proofs bearing thereon I am inclined to the opinion that there was a country road as distinguished from the post road along Hart's Line, and accordingly so find." By this finding of a traditional country road the plaintiff's line is made to pass south of the lake in controversy, and under the construction given to the grant the lake is excluded from the boundaries, and the title is found to be in the town of Brookhaven, although the evidence is plain that up to very recent years the town has never made any claim of ownership. It shows no paper title to the land surrounding the lake, unless it be held that this shadowy highway, described by one of the defendants' surveyor witnesses as "a wood road following this line for a mile or two," is held to have been the country road on which these early patents, intended to reach to the center of the island, were bounded on the north.

A careful examination of this case fails to satisfy us that the evidence supports this conclusion, and we are confirmed in this view by an examination of the laws relating to this subject, which, had they been called to the attention of the court, must have resulted in a different judgment. It should be borne in mind that the patent to William Nicoll, from whom the plaintiff derives title, was bounded on the north, not by the middle of the island, as many of the contemporaneous instruments recited, but by the country road. It is important, therefore, to determine just what was meant by "the country road." It will be conceded, no doubt, that legislation in reference to highways follows, in a large measure, the customs and usages of the community for which such legislation is enacted; it is a codification of the experiences and the aspirations of the time in which it is brought forth. Keeping this in view, and remembering that this grant was made to William Nicoll in the year 1697, we desire to call attention to chapter 131 of the Colonial Laws of New York (1 Colonial Laws N. Y. p. 532), entitled "An act for the laying out, regulating, clearing and preserving public common highways throughout this Colony." This act was passed June 19, 1703, six years after the Nicoll patent, and provides, so far as material to the question now under review, as follows:

"For the better laying out, ascertaining, repairing and preserving the public common and general highways within this Colony. Be it enacted by the Governor, Council and General Assembly of this Colony and by the authority of the same, that there be laid out, preserved and kept forever in good and sufficient repair one public, common and general highway to extend from the now scite of the City of New York through the city and county of New York and the county of Westchester of the breadth of four rod English measure at the least, to be, continue and remain forever the public, common, general road and highway from the said city of New York to the adjacent Colony of Connecticut. And also one other public, common and general highway to extend from the ferry in Kings County through the same county, Queens county and the county of Suffolk of the same breadth of four rod English measure at the least to be, continue and remain forever the public, common general road and highway from the ferry aforesaid to the town of East Hampton in the county of Suffolk." (There is also provision for roads of like description through the various local counties, including one to Albany.)

"And be it further enacted by the authority aforesaid that there shall be common highways laid out, ascertained, repaired and preserved forever of the breadth of four rods English measure, as well from the several towns and villages within this Colony to their next contiguous towns and villages and from one town or village to another as to the several and respective public common and general roads and highways before mentioned, and to such convenient landing places in each respective town and village where their respective situations will afford and require it for the better and easier transportation of goods and the commodious passing of travellers, as direct and convenient as the circumstances of place will admit of, at the directions of the commissioners respectively hereafter mentioned." (Then follow provisions for punishing those who "stop up, lessen, contract, narrow, or incroach on any common, general or public road or highway"; for placing the burden of amending and repairing upon the owners of the several townships, manors, and land by or through which any common, general, or public road or highway shall be laid out, and for permitting the erection of good, easy-swinging gates to be erected upon any of the common highways for the several towns, as distinguished from the common general public highways, which are to remain for free passage, the object of the gates being to permit cattle to run at large in these subhighways.) See 1 Colonial Laws N. Y. p. 798, c. 270.

"Provided always and it is the true intent and meaning of this act that all the roads and public highways by this act intended shall be of four rod at the least in such as are now already used and laid out and of the breadth of six rod at the least where any new public road or highway shall hereafter by virtue of this act be laid out."

The above act, with some unimportant amendments, was kept in force, in so far as it related to Suffolk county, during the entire colonial period, and up to 1785. See chapters 131, 144, 154, 182, 270, 386, 404, 422, 459, 471, 536, 575, 686, 888, 1399, and 1709 of the Colonial Laws of New York. It provided for one common general public highway through each of the several adjacent counties, and for "lesser roads" (1 Colonial Laws, p. 1024, c. 372), and "the country road" was the main through highway from the ferry in Kings county to the town of East Hampton, in the county of Suffolk. It belonged to the country at large, as distinguished from the highways connecting the local towns and villages and their several landing places, which roads were to be constructed at the discretion of the commissioners, while the laying out, improving, and maintaining the "public common general road and highway," which was "to be, continue, and remain forever," was made mandatory. There was to be but one "public, common general road and highway from the ferry aforesaid to the town of East Hampton," the extreme eastern town of Suffolk county, and it was natural that it should be known as "the country road" or the post road to the present day. It was the country road; it belonged to the country; it was under the direct charge of the country, as distinguished from the owners of the towns and manors; and it was one of the highways in existence at the time of the enactment of the legislation above set out, and with reference to which the enactment was made; for, as we have already pointed out, it was a mere path through the town of Brookhaven in 1693, when the grant was made to Col. Smith, but a necessary line of communication between the sparsely settled communities, and it was "for the better laying out, ascertaining, repairing and preserving the public, common and general highways within this Colony" that the legislation was adopted. There were roads and pathways along the general lines laid out for these "public,

common and general highways." Many of them had been in existence for years, for we find by chapter 413 (2 Colonial Laws, p. 63), passed July 27, 1721, entitled "An act to continue the Common Road or the Kings Highway from the Ferry towards the town of Breuckland [Brooklyn, 14 Ency. Brit. 866] on the Island of Nassaw in the province of New York," that "the said road, as it now is, has been so far at least this sixty years last past, without any complaint, either of the inhabitants or travellers." This would take this road from the ferry, which is the starting point of the common, general public highway, through Kings, Queens, and Suffolk counties, back to 1661; and the fact that in 1693 and in 1697 large public grants were being made, bounded on the north by "the country road," which was "esteemed to be the middle of the island," the conclusion is irresistible that "the country road" was the one contemplated by the legislation of 1703, which was to remain forever. If the island be measured, excluding South Bay, it will be found that the post road of to-day is practically in the center of the island. It was natural, under the road scheme which then prevailed, that the public, common general highway should run about midway of the land, the object being to accommodate both shores, and without any reference to the mathematical center of the island, as determined by measuring the five or six miles of South Bay and the neck of land which forms it; and it was entirely consistent, in dealing with land grants, that the highway through the middle of the land should be esteemed the middle of the island for the purpose of determining boundaries, and the fact that private individuals may have subsequently adopted some other line in making transfers of property cannot operate to limit the plaintiff's right to the lake which was south of this "country road."

Thus, within six years of the date of the Nicoll patent, we find the Legislature providing for a permanent system of highways, and with this legislation in full force up to 1785, forbidding the destruction of any of the general or common highways, we are asked to believe that a wood road constructed upon a line of which there is no record until about 1797 was the country road referred to. This construction, appropriate enough for a deed of to-day, ignores the history of "the country road" as it existed, and as it was understood at the time of making the grant now under consideration. A country road at that time was not a road remote from a city, or a backwoods road, but a road which was for the common use of the country as a whole—as a nation. It was the main highway, connecting up the small communities and neighboring colonies, and was demanded by public policy, rather than by considerations of private convenience, this latter being served by the discretionary roads, with their swinging gates and their cowpasture conveniences. It ran the whole length of the island at approximately its center, from a practical standpoint, and it made a convenient and practical center boundary line. What more natural than that "the country road," a permanent monument created by public necessity, should become the boundary of the grant to William Nicoll? What more unreasonable than the theory that a permanent patent should be bounded on a remote wood road, not a trace of which remains upon any record which the defendants have been able to produce, and which

only extended a mile or two along the Hart line? If we read the description as bounded on the north by "the state road"—and this is its true significance—all element of uncertainty is removed. The grants prior to 1693 were bounded by the center of the island, or the midst of the island, for the obvious reason that there was no general highway running through the middle of the island, which had reached so far out from the ferry in Kings county. In the latter year there appears to have been a path as far as the eastern limits of the town of Brookhaven, known as the country road, and this was "esteemed to be the center of the island," an agreement being entered into between Col. Smith and the town of Brookhaven which provided for fixing the land boundaries two poles or rods from the path, for the obvious reason that the highways of that day were laid out at least four English rods wide. In 1697 the description in the patent to William Nicoll abandoned all reference to the middle of the island, and adopted the country road as the northern boundary, and six years later the Legislature provided for the "better laying out, ascertaining, repairing and preserving * * * one other public common and general highway to extend from the ferry in Kings county through the same county, Queens county and the county of Suffolk of the same breadth of four rod English measure at the least, to be, continue and remain forever the public common general road and highway from the ferry aforesaid to the town of East Hampton in the county of Suffolk." There was but one country or state road through the town of Brookhaven, and the description in the William Nicoll patent could not have been satisfied with any other road.

In view of this legislation, extending from 1703 to and beyond the colonial period, as will be seen by a reference to the chapters of Colonial Laws above cited, the Hulse map of Brookhaven (plaintiff's Exhibit M) is most significant. This map was made in October and November, 1797, 100 years after the William Nicoll patent issued, and is the first record of the Hart line, so often referred to in the case, and which the learned court at Special Term has found as the northern boundary of the patent. This line is undoubtedly the mathematical center of the island, measuring across South Bay and the narrow strip of land which incloses the bay at the south, and runs south of the lake involved in this controversy. But the patent does not pretend to be bounded on the north by the center of the island, either mathematical or otherwise; it is bounded by the country road. The Hulse map shows the "Post Road," as it is called on the map, and then it refers to the "west division of long lots, north side of the country road," to the "east division of long lots, north side of the country road," and again to "division of new lots, south side the country or post road," and these several divisions are upon the north and south sides of "the country or post road," respectively. The map is drawn in great detail; it gives the location and name of the churches, the mills, the residences of the justices of the peace, and other prominent individuals, and indicates the location of the houses of apparently all of the others, for they are dotted all along the coast road, as well as along the subordinate roadways. It is a most significant fact that, while these houses and roadways are to be found in nearly every part of the town, there is not

a house or a roadway within a long distance of the Hart line where it is supposed to bound the Nicoll patent, and there is nothing on the map to suggest that a roadway along that line ever existed.    If there was a roadway, sufficiently well defined to constitute not only the northern boundary of the William Nicoll patent in 1697 (this patent being on the westerly borders of the town of Brookhaven), but of the St. George manor, in the eastern portion of the town, in 1693, it does not seem possible that it would have entirely escaped the attention of Isaac Hulse in 1797, when he was engaged in the work of making a detailed map of the town.    Roads in those early days were works of prime necessity; they were constructed to serve a practical purpose, and were not undertaken unless the situation imperatively demanded them.    Once constructed, it may be assumed that they were not readily closed or abandoned, in a community which was not given to rapid changes, and in which the occupations of the people were not fluctuating.    The same necessity which called for "the country road" in 1693 and in 1697 existed in 1703, and from that time on through the colonial period the statute required all of the public highways, whether of primary or secondary importance, to be maintained forever, so that it is almost absolutely certain that there was no highway along or near the Hart line at the time of granting the William Nicoll patent.    A mere wood road would not answer the calls of the description, even if it were established that such a road was in existence.

It is probably true, so far as we are able to trace the lines, that the William Nicoll patent overlapped the Smithtown grant to a certain extent, and there is some evidence in the case that some of the land embraced in the same patent has since been claimed under deeds from the town of Brookhaven; but these matters have no bearing upon the question at issue here, which involves merely the title to the lake.    The grant, so far as it overlapped the Smithtown grant, if it did, was void, under the rule that the King cannot grant the same thing in possession to one which he or his progenitors have granted to another. Broom's Legal Maxims (4th Ed.) 80.    The fact that the heirs of William Nicoll may have surrendered rights in real property, and have accepted a different line from that originally established as the northern boundary in some of their private deeds, cannot be controlling here.

In 1731 the trustees of Brookhaven adopted a resolution in reference to lands lying south of the country road, and which embraced, undoubtedly, some of the lands within the boundaries of the original patent to William Nicoll, through whom the plaintiff derives his title; but this resolution "reserved for the use and benefit of the inhabitants of the town forever all the rivers, ponds and swamps and places where water usually stands; also the lands six rods wide round each river, pond and swamp where water usually stands."    It is clear, therefore, except by a possible inference, there was no claim of ownership in the town to the lake here in controversy, which in 1860 was found by the trustees of the town to be outside its jurisdiction, and all ponds were expressly reserved out of the operation of the resolution, so that even this action has no bearing upon the title to Raconckomy pond, the record title of which is clearly in the plaintiff, as shown by the conveyances in evidence.

The judgment appealed from should be reversed, and a new trial granted, costs to abide the final award of costs. All concur, except BARTLETT, J., not voting.