ROCKAWAY PARK IMPROVEMENT CO., Limited, v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. October 7, 1910.)

1. NAVIGABLE WATERS (§ 37*)—GRANTS—CONSTRUCTION—"SEA."

An ancient patent described its southern boundary as the "sea." The two rivers which were the eastern and western boundaries flowed into a bay which was affected by the tides. The grantee never made any claim of ownership to the ocean, as the southern boundary reached, by extending eastern and western lines, some four miles to the ocean. A subsequent patent of adjacent lands used the words "sea or main ocean" as a boundary. Held, that the north shore of the bay formed the southern boundary; the word "sea," at the time of the patent and for a long time thereafter, being used as synonymous with the word "bay."

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*

For other definitions, see Words and Phrases, vol. 7, pp. 6359, 6360.]

2. NAVIGABLE WATERS (§ 37*)—GRANTS—CONSTRUCTION.

An ancient patent of land to Jamaica was bounded on the south by the "sea." An ancient patent to Hempstead was bounded on the south by the "sea or main ocean." A disputed boundary between the two towns was settled by an agreement, which fixed a line not running to the ocean as the boundary of Jamaica, and which recited that the agreement should not hinder Hempstead from running the line south to the sea. A confirmatory patent, referring to the agreement, was granted to Jamaica. Held that, under the agreement and confirmatory patent, Jamaica could not extend the boundaries of the original patent to the ocean, especially in view of the fact that the state, by various acts of the Legislature and by grants of land, had asserted ownership of the land under water, without protest from Jamaica.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. NAVIGABLE WATERS (§ 37*)—GRANTS—CONSTRUCTION.
  The rule that a grant by the sovereign of land on tide water extends only to ordinary high-water mark gives way to intention expressed to grant to low-water mark.

  [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 212; Dec. Dig. § 37.*]

4. NAVIGABLE WATERS (§ 37*)—GRANTS—CONSTRUCTION—"BEACH."
  An ancient patent to an individual bounded the land on the south with the "main sea or ocean to low-water mark," and on the west with the inlet which makes the bay between Jamaica and a neck of land, together with ponds, beaches, etc. *Held*, that the grant was to low-water mark; the word "beach," in describing the thing granted, meaning tideway, though it may be used, for purposes of boundary, to describe the shore above high-water mark.

  [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 212; Dec. Dig. § 37.*

  For other definitions, see Words and Phrases, vol. 1, pp. 725, 726.]

Appeal from Trial Term, Queens County.

Action by the Rockaway Park Improvement Company, Limited, against the City of New York. From a judgment for defendant, plaintiff appeals. Reversed, and new trial granted.

Argued before HIRSCHBERG, P. J., and BURR, THOMAS, RICH, and CARR, JJ.

Leavitt J. Hunt (Robert McLeod Jackson, on the brief), for appellant.

Clarence L. Barber (Theodore Connoly, on the brief), for respondent.

THOMAS, J. Each party asserts title to some 16 acres of land below mean high water in Jamaica Bay north of Rockaway Neck. The defendant traces title from the Nicolls patent of 1666 and the Dongan patent of 1686. The plaintiff claims under a patent made in 1685 by Gov. Dongan to Palmer, whereby Rockaway Neck to the Hempstead line was conveyed, and under letters patent to it made by the state in 1899. Defendant's contention is that it owns all of Jamaica Bay south of its upland, and therefore the land under the bay to mean high water on Rockaway Beach. The Nicolls charter bounds the land granted to Jamaica "south with the sea." The defendant finds the intended sea at the main ocean, and so includes in its grant Jamaica Bay and Rockaway Neck. But as early as December, 1684, two years before the Dongan patent to Jamaica, and one year before the Dongan grant to Palmer, it is in writing declared by Jamaica that it has "no pretence to Rockaway Neck." If this is an assertion that it did not own Rockaway Neck, it follows that it did not own to the main ocean, and the word "sea" would mean Jamaica Bay. In such case the land granted to Jamaica would be bounded on the south by the bay.

But the defendant urges that by the words used Jamaica was releasing, not denying, ownership; that Nicolls had granted, and it was surrendering. To whom? The words are interpolated in an agreement to settle the line between Jamaica and Hempstead, its neighbor on the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

east. This dispute was composed, the witnessing clause was written, and then followed, before signature, these words:

"Mem. We have no prtence to Rockeway Neck that is Jameca."

Two years later, in the Dongan grant of 1686 to Jamaica, this agreement and memorandum are recited, and the grant as described in the Nicolls patent confirmed, qualified by the line established by the towns. Had a release been intended, a more formal and definite instrument expectably would have been used, and the person benefited made a party thereto, or at least mentioned. It is considered that it was not intended to execute a release running to the sovereign, and it is not suggested that it affected Hempstead.

There will be occasion later to analyze the agreement, but as preliminary to other discussion it is remarked that, while it was organizing and perfecting its bounds and title, Jamaica in writing proclaimed that it did not claim the main ocean as its south line. But that Jamaica's holding did not include the bay is made certain by the words of its grant. What do the Nicolls and Dongan patents to Jamaica grant? The Nicolls patent recites the purchase by Jamaica of lands, the improvement of part thereof, and the settlement of families thereon, and for a confirmation of the possession and enjoyment of the premises ratifies, confirms and grants:

"All that Tract of Land which already hath beene or hereafter shall bee Purchased for and on the behalfe of the said Towne of Jamaica whether from the Natives Proprieto:rs or others wthin ye Lmitts and Bounds hereafter Exprest."

The Dongan patent of 1686 states the same. That patent recites the Nicolls patent, the agreement of 1684 between Jamaica and Hempstead, allotments made by Jamaica, the application for confirmation of the tract contained in the former patent as limited by the agreement, and "for a Confirmation unto the Present freeholders and inhabitants of the said Towne * * * for ever in the Quiett and Paceable Possession and Enjoyment of the aforesaid Tract of land and premissess Divisions allotments and Settlements made at Severall Towne Meetings," the grantor ratifies, confirms, and grants:

"All the before Recited and Parcells of Land Divisions Alotments and Settlements made at Severall Towne metings of the said Towne and Premisses Sett forth Limitted and Bounded as aforesaid by the aforemenconed Pattent and Agreement."

This patent is to confirm the Nicolls patent, in view of the allotments made and to be made, and the agreement with Hempstead. Therefore the Nicolls patent is the source of Jamaica's title. But that patent grants only what Jamaica shall obtain from the native proprietors or others within limits. Hence reference must be made to other earlier or later grants. There are no grants to Jamaica affecting this question, save by the Indians. To such Indian grants recourse must be had. There are three—one confirmed by Gov. Stuyvesant on the application in 1656, one of land west thereof, and one of land northward thereof. The trial court found that such Indian deeds of 1655 and March 13 and 19, 1663, did not include any of the premises in question. With this finding, and in the absence of evidence of other grants to Jamaica

covering the land in question, I find no basis for defendant's claim. What Jamaica had or should get from others within limits the Nicolls and Dongan patents granted them. Jamaica never got from others the land in question. Therefore the patents do not grant it.

Townsend v. Trustees of Brookhaven, 97 App. Div. 316, 89 N. Y. Supp. 982, suggests some support to this conclusion. But the Nicolls and Dongan patents to Jamaica with exactness make the bay the south boundary. The antiquity of the grant seems to tempt to unneeded interpretation. The description in the Nicolls patent is:

"The Easterne Bounds begining on the East side of the little Plaines to extend South East to Rockway Swamp Then North East from Hempsteed Bounds to runne west as the Trees are Markt on or about the Middle of the Hills untill it reach to fflushing Creeke which are their North Bounds and divides them from the Towne of Flushing (according to an order made at the Gen:all Meeting at ye Towne of Hempsteed in the Moneth of March 1664) Then to Meete New Towne Bounds at ye Southward Edge of the Hills, The Northwest Corner begining at Certaine Markt Trees at the edge of the said Hills from wence to runne in a South Line to a Certaine River that is to the East of Pleuders Neck and bounded South with the Sea."

This can be traced on Stewart's map of 1797. The first or easterly line runs southerly "to Rockaway Swamp," which is at the head of Rockaway river, now Hook creek. The second is the northerly line, which runs from Hempstead's west line westerly as shown by marked trees to Flushing creek, and thence to meet the new town bounds at the southward edge of the hills to the northwest corner. The third or west boundary line runs from the northwest corner in a south line "to a Certaine River that is to the East of Pleuders Neck." This river is Old Seller river, also called Mill creek and Spring creek, and flows into Jamaica Bay. The fourth or south bound is the "Sea." So the east line as described ends southerly at Rockaway Swamp, the source of Hook creek, and the west line ends southerly at Old Mill creek, both of which rivers flow into Jamaica Bay.

The defendant's contention is that these east and west lines were by the word "Sea" protracted some four miles to the ocean to meet the claimed south line. But the lines end where the description stops them by words of unmistakable location, and at their terminations is a body of water which is the sea, and was known as such, and was so called. Sharing the tides, it stretches away to the southward to meet the main ocean, of which it is a part, with such environment of land as to permit identification by a name. The grants by the Indians to Jamaica by their descriptions exclude the bay, as found. It is expectable that the first settlers, looking out on this great water, would have spoken of it as the sea, as it technically and in fact was. The Indian deed of July 11, 1666, conveys to Rustdorpe—that is, Jamaica—meadows and uplands, bounded by a "Line from the head of the aforesaid River, to rune close to the South Line, being the South Sea," and makes "over all the Lands and Meadowes, within the said Bounds, from the Sea Southward, to the Hills upon the North." The learned trial justice found:

"That in the seventeenth century the words 'sea' and 'bay' were used to indicate what is now known as Jamaica Bay."

In 1674 the Jamaica town meeting allotted to one Oldfields a lot of land, and limited it by a line that ran "down to the sea"; and in 1683 a deed from one Lynas used the words "fronting upon the upland and the reare to the seae as the rest of the lots doe." The record further, by instances, illustrates this use of the word. It was similarly used in the Dongan patent to the adjoining town of Flatbush in 1685, where is the language:

"From thence with a Southerly Line to the Kill or Creeke by the East of the Plunders Neck and soe alongst the said Kill to the Sea."

Each party invokes the agreement of 1684 between Jamaica and Hempstead. To appreciate fairly the agreement, the Nicolls patents to Hempstead of 1666 and 1667 should be considered. The patent of 1666 describes two lines running south or southward to the sea, constituting the eastern boundary, and a line "rune to the head or middle of Mathew Garretsons Bay to the Sea," and adds:

"They are bounded to West by the East Limitts of the Townes of fflushing and Jamaica, and South by the Sea or Main Ocean."

Here the "Sea" is particularized as the "Ocean." It should be observed that the west bounds are Flushing and Jamaica, which aids the defendant. In the Nicolls patent of 1667 there is similar description, save the following substitution with reference to the Flushing and Jamaica line:

"ffrom ye North West Bounds aforespecifyed a Lyne is to Run crosse ye Land by the East Lymitts of the Towne of Flushing & Jamaica & so to goe South to the Sea or Maine Ocean."

So Jamaica's east line had been described in the Nicolls patent of February 15, 1666, and Hempstead's west line by the Nicolls patents of March 6, 1666, and March 6, 1667. Differences arose about the "bounds of the townes," and it was settled in the agreement of 1684, which provides:

"That Jameca bounds Eastward betwixt Hempsteed and them Shall bee and Remaine and Continue where their Indian Purchase line runs beginning att the hills and soe Running to the mouth of Rockeway Swamp which line is made by marked trees markt and run by the Indians, the former Owners of the Land."

It is plain that for the bounds of Jamaica the Indian line was adopted, and such line does not run to the ocean. The words above definitely stop it at Rockaway Swamp. But to make it clear that Hempstead's line was not limited by the termination of Jamaica's line, it was immediately added:

"This our Agreemt. shall not hinder Hempsteed Men from Running there Antient line from the head of Mattagarisons bay south to the sea."

This left the line for Jamaica and Hempstead terminated just as the Nicolls patents placed it. But after the testing clause had been written there seems to have been some further discussion or suggestion, and the words were added:

"Mem. We have no prtence to Rockeway Neck that is Jameca."

Then the agreement was signed, and thereafter Jamaica apparently was not content with the stipulation that its east line should run to "Rockeway Swamp Mouth," and there was added what the Dongan confirmatory patent to Jamaica calls a "postscript," as follows:

"Whereas it is mentioned in the within written Agreemt. that Jameca bounds Shall run to Rockeway Swamps mouth it is to be understood that Itockeway River that runns out of Rockeway swamp Shall be Jameca east Bounds and that all the Meadows lyeing on the west side of the said River shall belong to Jameca."

That river is Hook creek, which empties into Mattagarisons Bay, where Jamaica's east line by the agreement ended, and whence Hempstead's west line continued to the ocean. This line, so clearly fixed by varieties of express statement, should not be disturbed by attempted interpretation. There is no ambiguity, and construction is not required or proper. It is true that on several occasions Jamaica indicated a sense of proprietorship by taking action respecting fishing in the bay, the cutting of sedge grass therein, and leasing lands therein. These matters sifted, and appreciated in their proper proportion, would be useful in case of doubt; but, in view of the unequivocal language of the grants and agreement, they suggest nothing more than unwarranted, but desired, appropriation.

Their force is diminished, if not neutralized or overcome, by acts of ownership on the part of the state, and submission thereto by the town. In 1822, by Laws 1822, c. 235, the state authorized the election of trustees to control the common lands and marshes belonging to the town "as far forth as the said town is entitled to the same." In 1849 the state undertook the regulation of the planting of oysters in Jamaica Bay through the supervisors of the county, and since that time Jamaica has derived any authority exercised by it relating to leasing for oyster beds from the state, although it has been the policy of the state since 1895 directly to make leases for oyster beds in the bay and receive the revenue therefrom. The state has by many grants of land in Jamaica Bay asserted its ownership thereof, and, as found by the trial court, without protest on the part of the town or this defendant. Indeed, upon the application for the present grant to the plaintiff, the defendant was heard in opposition, but asserted no title to the land in question. In fact, it or its predecessors have never undertaken to convey title under water.

Proprietary acts similar to those here invoked were common on the south shore of Long Island, and their significance depends upon the title, real or colorable, pursuant to which they were done. In Lawrence v. Town of Hempstead, 155 N. Y. 297, 49 N. E. 868, the town of Hempstead ineffectually relied upon such acts as against the holder of the legal title. The defendant's counsel has gathered numerous private deeds, resolutions of the town of Jamaica, and legislative acts that aid defendant's contention. It is undoubted that from 1700 through the greater part of the nineteenth century Jamaica in resolutions used language that carried assertion of control and ownership to the bay. Hence, if for purposes of gaining title that is sufficient, Jamaica owns the bay.

Attention is called to Laws of 1813, chapter 39, wherein the town of Jamaica is described as the western boundary of Queens county. The Stewart maps of 1797, already consulted, show the boundary line between Kings and Queens counties terminated at the ocean. But the Indian deed and patents end that line at Old Mill creek in language that no map may gainsay. The map of the division line between Hempstead and Jamaica, surveyed in 1878 by authority of the state, places the termination of the eastern line of Jamaica at the mouth of Hook creek, and the charter of Greater New York shows that Jamaica's east line does not extend southerly beyond the north shore of Jamaica Bay. The defendant by assertion would protract this line, but preference is due to the definite boundaries designated in the patents. It is true that the Nicolls patent, after defining the boundaries earlier granted, adds:

"All w.ch said Tract of Land together with the Necks there unto belonging wthin the bounds and Limitts aforesaid And all or any Plantacon there upon are from hence forth to belong to the said Towne of Jamaica. Together with all Havens Harbo.rs Creekes Quarryes Woodland Meadowes Pastures Marshes Waters Rivers Lakes ffishing Hawking Hunting and ffowling And all other Proffits Commodites Emolumts and Hereditam.ts to the said Land and prmisses wthin the Limitts and Bounds afore mentioned described."

The only words helpful to defendant are "Havens Harbo.rs." Considering the exact easterly and westerly lines delineated in the patents, it would be more reasonable to look for the havens and harbors along the northerly side of the bay, within a line connecting such easterly and westerly lines at their southern termination, than for the purpose of finding "Havens Harbo.rs" to carry such lines to the ocean, thereby taking in the bay and Rockaway Neck, neither of which is named, or in any wise suggested by faint or remote reference. The patent contemplated that the town would divide, allot, and distribute the land acquired to its inhabitants, and it will not be presumed, in the absence of "clear and express words" denoting it, that it was the intention to surrender for that purpose to a single town a part of the sea, whose tideway also reached the shores of the towns of Flatbush and Flatlands, and included the beaches of Rockaway Neck, to which Jamaica made no pretense. Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997; De Lancey v. Piepgras, 138 N. Y. 26, 33 N. E. 822.

The improbability of giving such control of the bay to Jamaica is a matter of judicial consideration. People ex rel. Underhill v. Saxton, 15 App. Div. 270, 44 N. Y. Supp. 211; Town of Southold v. Parks, 41 Misc. Rep. 456, 461, 84 N. Y. Supp. 1078. This improbability is strengthened by the Dongan patent of November, 1685, to Flatbush, where in the description of the easterly line it is stated:

"From thence with a Southerly Line to the Kill or Creeke by the East of the Plunders Neck and soe alongst the said Kill to the Sea."

As already stated, Jamaica's west line is described:

"From wence to runne in a South Line to a Certaine River that is to the East of Pleuders Neck and bounded South with the Sea."

The Flatbush east line by no intendment or claim runs to the ocean, taking a portion of Jamaica Bay and Rockaway Neck. How, then, can

Jamaica's west line, stopped at Old Mill creek, be protracted to the sea? Moreover, if Jamaica took the land under the bay, it took to high-water mark on all beaches south of it, thereby depriving the owner, whether the state or others, of uplands to the adjacent beach to low-water mark. If the acknowledgment that Jamaica had no pretense to Rockaway Neck was a release to the state, then the state took back land only to high-water mark, and left Jamaica with land below high water, which it could not utilize, except to obstruct the enjoyment of the uplands. It is not credible that the sovereign, deemed to reserve in private grants below high-water mark, would accept a release of land that limited it to high water.

The patent to Palmer remains for discussion. I have earlier adverted to the inconsistency, even in view of the disclaimer in the agreement with Hempstead, of construing the patent to Jamaica as extending to the ocean, and including Rockaway Neck; but if the patent to Palmer extended to low-water mark, then it would be more difficult to conclude that Nicolls had already granted the same land under water to Jamaica, and that Dongan, a year later than the Palmer patent, confirmed Jamaica in the same holding. The trial court found that Rockaway Neck was originally granted by the Nicolls patent of 1666 to Jamaica, that the agreement with Hempstead "constituted a surrender and release by the town of Jamaica of its title to the lands and uplands on Rockaway Neck or Beach" between mean high-water mark on each side of the Neck, whereby such lands "became revested in the crown," and that the Dongan patent of 1685 vested the same in Palmer, limited, however, to high-water mark on the north shore. Palmer, by license of Gov. Dongan, obtained title to Rockaway Neck from the Indians by deed dated October, 25, 1685, although there had been no release to the Indians, nor former grant of the lands by the Indians. The order appointed Welles—

"to Survey and Lay out for the said John Palmer soe much of the said Land and meadow belonging unto the said Neckes as Lyes without the bounds of the said Towne of Hempstead."

The Dongan patent to Palmer, based on such Indian deed, bounds the land:

"On the East with Hempsted West Pattent Line on the South with the Maine Sea or Ocean to Low Water Marke and on the West with the Gutt or Inlett which makes the Bay or Sound betwixt Jamaica and the said Tract Parcell of Neck of Land and on the Northward with the said Bay or Sound as it Runns East or Easterly untill it Comes unto or meets with Hempstead Line as aforesaid."

Now, observe the words, "the Bay or Sound betwixt Jamaica and the said Tract"; that is, Rockaway Neck. Dongan, familiar with the entire situation, denies the bay to Jamaica. Then the description:

"With all and Singular its Rights Members and Appurtennces together with all and all manner of Messuages Pastures feedings Meadows Marshes Woods Underwoods Wayes ffences Lakes, Ponds Creeks Beach or Beaches Ribers Brooks Springs Hunting Hawking Fishing and Fowling and Appurteunces whatsoever to the said Parcell Tract or Percell thereof in any wise belonging Adjoyning or Appurtaineing To Have And To Hold the said Tract Parcell or Neck of Land and Meadow and all and Singular other the Premissess hereby granted," etc.

The usual rule that a grant by the sovereign of land on tide water extends only to ordinary high-water mark must give way to intention expressed to grant to low-water mark. It was the intention that the grant should go to low-water mark on the south side, and with the subject in mind such explicit provision related to the north side was omitted. The learned counsel for defendant in his succinct and competent brief finds as a reason for the omission the previous grant of the land below high water to Jamaica. But the proffered reason is disputed by considerations to which I have alluded, and lastly by the statement in this very patent that the bay divides Jamaica from Rockaway Neck.

But the appellant finds the grant to low water in the separate specification of "Beach or Beaches * * * and Appurtennces whatsoever to the said Parcell Tract * * * in any wise belonging Adjoyning or Appurtaineing." But what makes doubt is that this language is applied to the south side of the land as well as to the north side, and yet it was deemed necessary to express the intention to go to low-water mark on the south side. The word "Beach," in describing the thing granted, means the tideway (Trustees of East Hampton v. Kirk, 68 N. Y. 459; Littlefield v. Littlefield, 28 Me. 180; Cutts v. Hussey, 15 Me. 237), although it may be used for purposes of boundary to describe the shore above high-water mark (Trustees of East Hampton v. Kirk, supra, 463; Wakeman v. Glover, 75 Conn. 23, 52 Atl. 622).

In Trustees, etc., v. Smith, 118 N. Y. 634, 23 N. E. 1002, 7 L. R. A. 755, the patent in question granted "necks and tracts of land * * * together with the waters, rivers, lakes, creeks, harbors, bays," etc., and it was considered that the bay was granted by express terms with all the benefits and privileges appertaining thereto. As the beach and beaches are expressly granted, and as they usually carry the grant to low water, I am inclined to the conclusion that the present case is not exceptional. In any case, it has been concluded that the Indians did not convey to the ocean, nor did they convey any part of the bay, that the east and west lines of Jamaica are stopped at two very definite points, and that "south with the sea" meant the north shore of the bay, and that the disavowal of Jamaica to the Neck was not a release, but a disclaimer, and that the agreement with Hempstead, confirmed by the Dongan patent of 1686, settled the east line and its southern termination beyond all possible contention; and it follows that the land under Jamaica Bay remained in the sovereign, and that the state, succeeding to the title, conveyed the land in question to the plaintiff.

The judgment should be reversed, and a new trial granted; costs to abide the final award of costs. All concur.